**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| **CODY C. DANTIN**<br>**Plaintiff** | **CIVIL DOCKET NO. 5:25-cv-00580** |
| **VERSUS** | **JUDGE S. MAURICE HICKS, JR.** |
| **MICHELE DAUZAT, ET AL**<br>**Defendants** | **MAGISTRATE JUDGE KAYLA D. MCCLUSKY** |

**RESPONSE TO ORDER TO SHOW CAUSE (DOC. 50)**

Defendant Warden Michele Dauzat respectfully submits this Response pursuant to the Court's Order to Show Cause (Record Document 51). For the reasons set forth below, the injunctive measures proposed in the Order are moot, unnecessary, and inconsistent with the longstanding deference federal courts afford to prison administrators in matters of internal security and housing.

## I. INTRODUCTION

The Court directed Warden Dauzat to explain why it should not (1) require submission of all 90-day reassessments of Plaintiff's housing status, (2) require all future reassessments to be submitted to the Court for pre-approval, and (3) order Plaintiff returned to Closed Cell Restriction ("CCR").

As of November 26, 2025, Plaintiff Cody Dantin was reassigned to CCR Protective Custody Level 2 pending further review. [Exh. 1, Declaration of Michele Dauzat, ¶15]. This reassignment was made out of an abundance of caution despite the continuing absence of any verified or credible threat to Plaintiff's safety. Because Plaintiff has already been returned to the very status he seeks, the primary relief contemplated in the Show Cause Order is **moot.**

What remains are two extraordinary requests that would improperly insert the Court into routine prison classification decisions—an intrusion squarely rejected by the Fifth Circuit. DWCC has responded to every complaint Plaintiff has made, often repeatedly, and has taken more measures than constitutionally required to ensure his safety. No further judicial intervention is necessary.

## II. BACKGROUND

### A. Plaintiff's History of Non-Specific, Shifting Safety Complaints

Plaintiff arrived at DWCC with a history of requesting protection and reporting generalized fears. On July 7, 2025, DWCC placed him in CCR Protective Custody Level 2 as a precaution. [Exh. 1, ¶3]. The next day, Plaintiff's sister emailed the Warden stating he "did not feel safe" around another inmate on CCR. [Exh. 1, ¶4]. A review of his records showed that none of the offenders on CCR at that time were declared enemies of Plaintiff. *Id.*

On July 18, 2025, Plaintiff received a disciplinary rule violation for property destruction (flooding his cell) and was sanctioned to 10 days of Disciplinary Segregation. [Exh. 1, ¶5]. Following repeated statements that he could not remain on CCR, DWCC convened a reclassification board, which reassigned him to Preventative Segregation Level 1. [Exh. 1, ¶6]. He was placed in a single-man, continuously monitored camera cell. *Id.*

At his next review, classification approved him for advancement to Level 2, but Plaintiff refused the move. [Exh. 1, ¶7]. Between September 29 and October 7, DWCC moved him from N-4 C tier to N-4 A tier because he again reported he could not live on N-4 C. [Exh. 1, ¶8]. On October 4, Plaintiff's sister emailed again stating he could not live

on N-4 A. [Exh. 1, ¶¶8, 9]. Deputy Warden Arnold spoke with Plaintiff on October 7, and—at Plaintiff's request—he was moved back to N-4 C tier. [Exh. 1, ¶9].

On November 22, Plaintiff's sister emailed a third time alleging Plaintiff was in danger. [Exh. 1, ¶10]. On November 23, Assistant Warden Kimball spoke with Plaintiff, who requested to be moved to the CCR "Law Enforcement" tier, a placement reserved for offenders who meet specific criteria that Plaintiff does not meet. *Id.* He again provided no specific threat, no names, and no evidence of danger. [Exh. 1, ¶11].

Throughout his time at DWCC, Plaintiff has never been housed with a cellmate due to his self reported fears. [Exh. 1, ¶12]. He has declared only one inmate, in April 2025, as an enemy—Arthur Basaludua—based on an unverified allegation that Basaludua told others Plaintiff "worked for the Warden." [Exh. 1, ¶13]. DWCC honored the keep separate request. *Id.*

Plaintiff has also stated on multiple occasions that he cannot live at any other facility and does not want a transfer, contradicting his allegations of imminent harm. [Exh. 1, ¶14].

**B. Plaintiff's Reassignment to CCR on November 26, 2025**

In light of Plaintiff's renewed complaints, and despite the lack of corroborating information, DWCC reassigned Plaintiff to CCR Protective Custody Level 2 on November 26, 2025, pending further review. [Exh. 1, ¶15]. This precautionary placement was not based on any objective finding of danger but was made to stabilize Plaintiff's housing while ongoing assessments continue.

Plaintiff now occupies the same protective status he seeks through injunctive relief. Accordingly, the request to return him to CCR is moot.

### C. No Investigation has ever been substantiated

DWCC has investigated every complaint made by Plaintiff and every email submitted by his sister, and at no time have staff identified a specific threat, a named offender targeting Plaintiff, any corroborating evidence supporting his cartel-related allegations, or any intelligence suggesting imminent harm. [*See* Exh. 1]. Plaintiff's reports have been consistently non-specific, shifting, and often contradictory, and his housing moves have occurred primarily at his own request based on these changing assertions rather than on any substantiated danger. *Id.*

These facts underscore why classification decisions must remain in the hands of prison administrators, not subject to judicial supervision or pre-approval.

### D. Exhibits Supporting the Administrative Record

In support of this response, DWCC submits several institutional records and policy documents under seal. The sealed exhibits include: the DWCC Classification Policy [Exh. 2]; Plaintiff's initial classification plan and subsequent reclassification plans [Exh. 3]; the DOC Custody Levels and Segregation Policy governing CCR and protective-custody procedures [Exh. 4]; movement and housing-assignment records documenting each placement and tier change from July through November 2025 [Exh. 5]; reclassification-committee findings and rationales [Exh. 6]; enemy-concern and security-threat assessment documents confirming no verified threats [Ex. 7]; incident and disciplinary reports relevant to his housing status [Exh. 8]; and email correspondence from Plainitff's sister [Exh. 9]. These materials provide the administrative record of Plaintiff's housing history, his reported safety concerns, and DWCC's responses during the relevant period.

## III. ARGUMENT

### A. The Request for CCR Reassignment is Moot

Plaintiff is currently assigned to CCR Protective Custody Level 2. [Exh. 1, ¶15]. His present housing status already satisfies the relief contemplated in the Court's Show Cause Order. "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982). There is no live controversy concerning CCR placement and no injunctive relief is required.

### B. The Court Should Decline to Require DWCC to Submit 90-Day Reviews

The Court's first proposed measure, requiring ongoing submission of Plaintiff's 90-day reviews, would be an unprecedented and unwarranted intrusion into the administration of a state correctional facility. The Supreme Court has long recognized that "[r]unning a prison is an inordinately difficult undertaking" that demands professional judgment, security expertise, and substantial resource allocation, tasks that lie "peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), *superseded by statute on other grounds*, 42 U.S.C. § 2000cc-1(a), *as recognized in Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).

Consistent with that principle, the Fifth Circuit has made clear that "[c]lassification of prisoners is a matter left to the discretion of prison officials." *Morgan v. Hubert*, 459 F. App'x 321, 325 (5th Cir. 2012) (citing *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir.1990)). Courts do not sit as classification boards, nor do they demand routine reporting of internal assessments absent a constitutional violation, which is not present here.

DWCC has conducted every review required by policy and has repeatedly gone beyond its obligations by investigating Plaintiff's non-specific complaints and adjusting his housing at his own request. [*See* Exh. 1]. Requiring DWCC to file its 90-day reviews with the Court would add nothing of value and would instead impose judicial micromanagement on day-to-day administrative decisions that the Constitution entrusts to prison officials, not federal courts.

### C. The Court Should Decline to Require Pre-Approval of Future Classification Decisions

The Court's second proposed measure, requiring DWCC to submit all future housing decisions for pre-approval, would be an extraordinary intrusion into prison administration. Such an order would impede DWCC's ability to respond promptly to security concerns, erode institutional authority, and shift to the judiciary a responsibility that Louisiana law assigns to trained correctional officials.

As this Court has recognized, "[i]n Louisiana, the classification of prisoners is the duty of the Department of Corrections and an inmate, such as Plaintiff, has no right to a particular classification." *Hilaman v. Bossier Maximum Facility Administration*, WL 1319159, at *2 (W.D. La. 2025) (Hornsby, Mag. J.), *adopted by* 2025 WL 1314115 (Doughty, J.).

Plaintiff's own conduct illustrates precisely why classification decisions must remain with DWCC: he has asked to leave a tier and then asked to return to it; he has refused movement to less restrictive statuses; he has declined transfers to other facilities; and he has never articulated a specific, verifiable threat. [*See* Exh. 1]. At every turn, DWCC has investigated his complaints and accommodated his shifting requests. *Id.* Nothing in

the record, nor in law, justifies federal judicial supervision of DWCC's routine classification decisions.

## IV. CONCLUSION

Plaintiff has already been reassigned to CCR Protective Custody Level 2, rendering the central issue moot. [Exh. 1, ¶15]. DWCC has responded to every safety concern Plaintiff has raised, conducted all required classification reviews, housed him alone, and moved him whenever he reports difficulty living on a particular tier. [See Exh. 1]. At no point has DWCC identified a credible threat or evidence that would warrant judicial intervention. [Exh. 1, ¶16].

For the foregoing reasons, Warden Dauzat respectfully requests that the Court decline to impose the extraordinary measures proposed in the Order to Show Cause and allow DWCC to continue managing Plaintiff's housing consistent with security needs and departmental policy.

Respectfully Submitted,

**LIZ MURRILL**
Attorney General
State of Louisiana

By _/s/ Holly H. Dorward_
HOLLY H. DORWARD (LSBA #40345)
Assistant Attorney General

**Louisiana Department of Justice**
Litigation Division
330 Marshall Street, Suite 777
Shreveport, Louisiana 71101
Telephone: (318) 676-5706
Facsimile: (318) 676-5703
E-mail: dorwardh@ag.louisiana.gov

**ATTORNEY FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2025, a copy of the foregoing *Response To Order To Show Cause (Doc. 50)* was filed electronically with the Clerk of Court using the CM/ECF system. I also certify that I have mailed by certified United States Postal Service, return receipt requested, this filing to the following non-CM/ECF participant:

Cody C. Dantin
#515835
David Wade Correctional Center
670 Bell Hill Rd.
Homer, LA 71040

/s/ *Holly H. Dorward*
HOLLY H. DORWARD
Assistant Attorney General